ARTRUDE L. W. RHINE, Appellant, *v.* NEW YORK LIFE INSURANCE COMPANY, Respondent.

2

Argued October 22, 1936; decided December 31, 1936.

*John Gerdes, Wilson E. Tipple* and *Everett Lewy* for appellant. The defendant, although a mutual corporation, is bound to perform the contractual obligations in its policies in the same manner as though it were a stock corporation. It has no power, by assessment or otherwise, to exact more than the premium stipulated in the policy. (*Cohen* v. *N. Y. Mutual Life Ins. Co.*, 50 N. Y. 610; *Hencken* v. *U. S. Life Ins. Co.*, 11 Daly, 282; 98 N. Y. 627; *Uhlman* v. *New York Life Ins. Co.*, 109 N. Y. 421.) The defendant may not deprive policyholders of substantial contract rights by subsequently inaugurating a new practice based on an interpretation of its policies which is contrary to the interpretation which its policyholders reasonably inferred from the defendant's practice when the policies were issued. (*Insurance Co.* v. *Dutcher*, 95 U. S. 269; *People* v. *Commercial Alliance Life Ins. Co.*, 21 App. Div. 533; *City of New York* v. *New York City Ry. Co.*, 193 N. Y. 543.) The binding force of the legal obligation of the defendant to perform its promise to supply the disability benefits for an annual premium of $2.96 is not diminished by the fact that it is in a contract containing other obligations. (*Ming* v. *Corbin*, 142 N. Y. 334; *Donley* v. *Glens Falls Ins. Co.*, 184 N. Y. 107; *Pyramid Life Ins. Co.* v. *Selkirk*, 80 Fed. Rep. [2d] 553; *Chattanooga Sewer Pipe Works* v. *Dumler*, 153 Miss. 276; *Penn Mut. Life Ins. Co.* v. *Hartle*, 165 Md. 120; *Guardian Life Ins. Co.* v. *Katz*, 243 App. Div. 11; *New York Life Ins. Co.* v. *Kaufman*, 78 Fed. Rep. [2d] 398; *Chambers* v. *New York Life Ins. Co.*, 148 Misc. Rep. 561; 240 App. Div. 1027; *New York Life Ins. Co.* v. *Davis*, 5 Fed. Supp. 316; *Rosso* v. *New York Life Ins. Co.*, 157 Miss. 469.) When a contract is severable or divisible,

the rights of the parties under each of the severable portions of the contract are determined independently, although a party may refuse to accept further performance of any promise in the contract if the contract as a whole has been materially breached by the other party. (*Pope* v. *Porter*, 102 N. Y. 366; *Tipton* v. *Feitner*, 20 N. Y. 423; *Pierson* v. *Crooks*, 115 N. Y. 539; *Ming* v. *Corbin*, 142 N. Y. 334; *Kinney* v. *McBride & Co.*, 88 App. Div. 92; *Anheuser-Busch Ice & Cold S. Co.* v. *Reynolds*, 221 App. Div. 174; *Wagner* v. *Gaudig & Blum Corp.*, 223 App. Div. 254; *Central N. Y. Tel. & Tel. Co.* v. *Averill*, 199 N. Y. 128; *Johnston* v. *Dahlgren*, 31 App. Div. 204; *Guardian Life Ins. Co.* v. *Katz*, 243 App. Div. 11; *New York Life Ins. Co.* v. *Davis*, 5 Fed. Supp. 316.)

*William Marshall Bullitt* and *Louis H. Cooke* for respondent. As there was no wrongdoing or mistake, the aggregate amount of divisible surplus is final and conclusive on all policyholders; and *prima facie*, the apportionment of such divisible surplus among its policyholders must be regarded as equitable. (*Uhlman* v. *New York Life Ins. Co.*, 109 N. Y. 421; *Greeff* v. *Equitable Life Assur. Soc.*, 160 N. Y. 19; *Equitable Life Assur. Soc.* v. *Brown*, 213 U. S. 25.) In 1931 the defendant was compelled, both by the inherent nature of mutual life insurance and the contribution method, to change from a zero to a negative disability factor in the distribution of surplus to plaintiff's policy. (*Miller* v. *New York Life Ins. Co.*, 179 Ky. 246; *Maddox* v. *Mutual Life Ins. Co.*, 193 Ky. 38.) Plaintiff's policy is a single insurance policy, with both death and disability benefits so interwoven as to constitute a single integral insurance contract. The apportionment of dividends thereon must be based solely on the contribution of her policy as a whole to the defendant's surplus. (*Donahue* v. *New York Life Ins. Co.*, 259 N. Y. 98.) Plaintiff is not entitled to one dividend upon the death portion of her policy and to another dividend on the disability portion of her policy — each portion of the policy being

treated separately from the other, and exactly as if such other portion did not exist. (*Donahue* v. *New York Life Ins. Co.*, 259 N. Y. 98; *Steinberg* v. *New York Life Ins. Ins. Co.*, 263 N. Y. 45; *Ginell* v. *Prudential Ins. Co.*, 205 App. Div. 494; 237 N. Y. 554; *Halperin* v. *Equitable Life Assur. Soc.*, 125 Misc. Rep. 422; *Ursaner* v. *Metropolitan Life Ins. Co.*, 146 Misc. Rep. 121; *Chambers* v. *New York Life Ins. Co.*, 148 Misc. Rep. 561; *Berg* v. *Equitable Life Assur. Soc.*, 149 Misc. Rep. 856; *Finklestein* v. *Metropolitan Life Ins. Co.*, 151 Misc. Rep. 113; *Lubow* v. *Prudential Ins. Co.*, 152 Misc. Rep. 62; *Garms* v. *Travelers Ins. Co.*, 242 App. Div. 230; 266 N. Y. 446; *Heilbronn* v. *New York Life Ins. Co.*, 243 App. Div. 558.)

LEHMAN, J. The defendant life insurance company issued, in 1927, a policy insuring the life of the plaintiff in the sum of $2,000 with provision for " disability benefits." In 1934 the insurance was split into two policies for $1,000 each, with similar provisions. The Insurance Law (Cons. Laws, ch. 28, § 83) commands that every domestic life insurance company " shall provide in every policy * * * that the proportion of the surplus accruing upon said policy shall be ascertained and distributed annually." In the same section the Legislature has defined the manner in which the proportion of the surplus " accruing upon said policy " shall be ascertained and distributed. From the surplus it earned during the year, the life insurance corporation may make certain deductions specified in the statute, and then must " apportion the remaining surplus equitably " to all the policies entitled to share therein. The plaintiff complains that since 1931 the defendant has not apportioned the surplus *equitably* to the policies entitled to share therein, but has discriminated unlawfully against life insurance policies which contain " disability benefits." The controversy has been submitted to the Appellate Division upon an agreed statement of facts. That court has decided in favor of the defendant.

The two $1,000 policies of the plaintiff are alike in all respects relevant to the controversy here. We, therefore, need set forth the provisions of only one. It provides that the insurance company agrees to pay to the beneficiaries named in the policy $1,000 upon receipt of due proof of the death of the insured. It then provides: " Such sum will be increased by any outstanding dividend additions and dividend deposits as provided herein. And upon receipt of due proof that the Insured is totally and presumably permanently disabled before age 60, as defined under ' Total and Permanent Disability ' on the second page hereof, the Company Agrees To Pay To The Insured Ten Dollars each month and to waive payment of premiums, as provided therein. This contract is made in consideration of the payment in advance of the sum of $30.30, the receipt of which is hereby acknowledged, constituting the first premium and maintaining this Policy for the period terminating on the Thirteenth Day of June, Nineteen Hundred and Twenty-eight, and of a like sum on said date and every twelve calendar months thereafter during the life of the Insured until premiums for Twenty full years in all shall have been paid from the date on which this policy takes effect."

The insurance company offered applicants for insurance a choice of form of policy with variations in benefits and obligations. Those who desired life insurance solely might obtain a policy identical with the policy issued to the plaintiff except that the provisions for disability benefits were omitted. The premium or consideration to be exacted for each policy is fixed by the company by calculation and estimate of the probable cost to the company of providing the particular assurance or benefit embodied in that policy. Calculation of the cost of life insurance is based upon certain data and assumptions; calculation of the cost of disability benefits is based upon other or additional data and assumptions. For a policy which provides life insurance alone the company exacted as premium the amount determined by estimate and

calculation as the cost of life insurance. For a policy like the plaintiff's, which provides exactly the same life insurance and, in addition stipulated benefits in case the insured becomes disabled, the premium exacted includes both the amount of the premium which would be exacted for life insurance alone and the amount determined as the probable cost of the additional benefits provided in case of disability. We are told that a regulation of the Insurance Department requires that in each policy there should be " a statement showing separately the amount of the extra premium charged for total and permanent disability * * * benefits." The plaintiff's policy contains such a statement. On the second page of the policy the clauses which relate to and define the disability benefits conclude with the following provision: " The total premium stated on the first page hereof includes an annual premium of $2.96 for Disability Benefits. Any premium due on or after the anniversary of the policy on which the age of the Insured at nearest birthday is sixty, will be reduced by the amount of premium charged for Disability Benefits. Upon written request signed by the insured and upon return of this policy for proper endorsement, the company will terminate this provision and thereafter the premium shall be reduced by the amount charged for Disability Benefits."

The statement of agreed facts shows that the aggregate premiums received by the company and the interest earned on its investments create one general fund from which are paid the death and disability claims, endowments, surrender value and other claims, the expense of conducting the business, including depreciation in investment values, and all other obligations of the company; and out of which also the reserves are maintained. The excess remaining in that fund, after these payments are made and sufficient reserves established, constitutes the divisible surplus to which the policyholders of the company are entitled both by statute and by the terms of their policies.

The Insurance Law requires that the apportionment be made " equitably." If the company issued but one form of policy to a single group of policyholders of the same age who paid the same premium, equality would be equitable, and any discrimination would be unfair. The Insurance Law contains provision which would indeed make such discrimination unlawful: " no life insurance corporation doing business in this state shall make or permit any discrimination between individuals of the same class or of equal expectation of life, in the amount or payment or return of premiums or rates charged for policies of insurance, * * * or in the dividends * * * payable thereon, or in any of the terms and conditions of the policy." (§ 89.) Insurance companies, however, issue policies with many variations in terms and conditions to individuals of different ages and unequal expectation of life. There the statute leaves discretion to each company as to what constitutes an " equitable " apportionment, and when " directors have exercised their discretion in regard thereto the courts will not interfere unless there is bad faith, or wilful neglect, or abuse of such discretion." (*Greeff* v. *Equitable Life Assur. Society*, 160 N. Y. 19, 32.)

Because the return on investments is not constant; because the expense of doing business, including losses sustained, varies from year to year; because no actuarial mathemetical calculation based on mortality tables enables men to determine years in advance when a policyholder will die or become disabled or even, with accuracy, how many policyholders will die or become disabled each year, premiums cannot be fixed at the exact amount necessary to provide a fund which is exactly sufficient to make the payments required year by year and to maintain proper reserves. To insure the stability of the company the premiums are fixed at an amount which is expected to provide a surplus if the company is well managed and its risks prudently selected. That expecta-

tion has always been realized. Each year the defendant company distributes as dividends to its policyholders many millions of dollars.

In their agreed statement of facts the parties have set forth that: " For about 50 years past, the principles and methods used by the New York Life in the calculation of its premiums, ascertainment of its dividends and the distribution of its Surplus to its policy-holders, have been subject to the scrutiny and inspection of, and have been approved by, the Insurance Departments of New York and of all of the States; and, until the New York Life withdrew from foreign countries, have been approved by practically every foreign Government. In such calculation, ascertainment and distribution, every policy issued by the New York Life has received precisely the same treatment and the same dividend per $1,000 insurance as every other policy in the same ' class ' as defined on pp. 70–72, *infra*.

" The ascertainment of the average ratios of Mortality, Disability, Expense, Interest, Surrender and Lapse (which the New York Life applied to each of said ' classes ') and the application thereof, involved a consideration of millions of items, and of many difficult and conflicting factors which have been determined by mathematical principles of great complexity. In ascertaining many of the elements going to compose those factors, it was necessary that determinations and decisions should be taken with respect to various facts, concerning which there might be a legitimate and honest difference of opinion between different companies and their various actuaries, and concerning the mathematical formulas to be used.

### " THE PLAN OF MUTUAL LIFE INSURANCE.

" Under such mutual plan, in order to provide for unforeseen contingencies, the premium to be paid by the member is fixed by the company at an amount somewhat in excess of that which the company anticipates will be

necessary in order to cover the cost of furnishing the insurance. The member pays that amount for the insurance in advance but later receives back such excess payment, if any, as a dividend, and thus gets the insurance at actual cost."

Since the factors upon which premiums are calculated vary with different forms of insurance and different groups of policyholders, the excess of the amount which the company " anticipates will be necessary in order to cover the cost of furnishing the insurance " over the actual realized cost will, of course, also vary. Anticipation may approximate realization more closely in some cases than in others. If each member receives back the excess payment he has made, then the apportionment must be based upon calculation of the actual cost of furnishing the insurance which the company provided for that particular policyholder. Accordingly the defendant company and all other mutual companies, in apportioning divisible surplus, use the " contribution " method which aims to distribute the divisible surplus amongst policyholders in the same proportion as the policyholders by their payments have contributed to that surplus.

The defendant in applying the " contribution " method does not attempt to determine exactly the proportion which each policyholder has contributed to the divisible surplus. That would not be practicable for reasons set forth in the agreed statement of facts. It has outstanding approximately 2,600,000 policies. It divides these into a great number of classes or groups — we are told approximately 150,000 — based upon variation in some factor which entered into the computation of the anticipated costs of furnishing the insurance when the premium is fixed or into the computation of the actual realized cost when the divisible surplus is apportioned; and it determines the amount which should be returned to the policyholders of each group or class accordingly. The plaintiff does not challenge the principle of the " contribution " method of apportioning the divisible surplus

and she challenges its application by the defendant company only in one respect. She maintains that the company is discriminating inequitably and unlawfully between holders of policies which provide life insurance only and holders of policies which provide life insurance with additional benefits.

The plaintiff's policy, as we have said, exacts a premium of $30.30 for life insurance and disability benefits and states that this premium "includes an annual premium of $2.96 for Disability Benefits" which the plaintiff may discontinue at will. The premium then which would be exacted for a policy exactly identical in terms, except that it does not provide for disability benefits, would be $27.34. These premiums were, it is not disputed, fixed, like other premiums, at "an amount somewhat in excess of that which the company anticipates will be necessary in order to cover the cost of furnishing the insurance." By calculations which the plaintiff does not challenge, the defendant company has determined that the premium fixed for *life insurance* has, as expected, been more than the actual cost of furnishing the insurance, but that contrary to the company's anticipations the "extra premium" included in the premiums paid to obtain a policy with additional "*disability benefits*" has, in every year since 1931, been less than the cost of furnishing those benefits.

Of the 2,600,000 outstanding policies of the defendant insurance company, about 1,000,000 provide life insurance only; and about 1,600,000 provide life insurance and in addition, for an "extra premium," disability benefits in case the insured becomes disabled. The holder of every policy of life insurance contributed to the divisible surplus the excess which he paid for such insurance over the cost of furnishing it; the holder of every policy which provided additional disability benefits depleted the divisible surplus by the amount in which the "extra premium" was insufficient to pay the cost of furnishing

the additional benefits. Then if the company repays to the holder of each policy of life insurance the amount which he paid in excess of the cost of furnishing the insurance and to the holder of each policy of life insurance with additional disability benefits, the excess of the total amount he paid for that policy over the cost of furnishing the life insurance *and* disability benefits, promised by that policy, the divisible surplus will have been apportioned to each policy in the same proportion as the holder of the policy contributed to that surplus and each policyholder will have paid the company the exact cost of furnishing the insurance or benefit promised by his policy.

That is the method used by the defendant since 1931 in carrying out the mandate of the Legislature and the stipulation of its policies, for the apportionment of its divisible surplus to all policies entitled to share therein. The premium of $30.30 exacted for the plaintiff's policy was based upon calculations by the company of the anticipated cost of furnishing the insurance and benefits provided in that policy and since, as stated in the policy, that premium included a premium of $2.96 for disability benefits, in addition to the premium of $27.34 which the company demanded for life insurance alone, the factor of the average risk of disability necessarily entered into the calculation of the anticipated cost of providing the stipulated benefits to the plaintiff in case disability should occur. In determining how much the total premium paid by the plaintiff was in excess of the actual cost of furnishing both the stipulated life insurance and the stipulated benefits in case of disability, the disability factor again necessarily entered into the calculations of the defendant company. The plaintiff concedes that these calculations establish that an annual premium of $27.34 per annum for the promised life insurance resulted in an average excess payment of $7.67 annually over the cost of furnishing the life insurance in the years 1931 to 1934,

and thus during the four years contributed the total sum of $30.67 to the divisible surplus of the company, while an annual premium of $2.96 for the additional promise of benefits in case of disability would result in an average annual deficit of $2.27 in payment of the cost of furnishing the additional assurance in case of disability in the years 1931 to 1934, and thus during the four years would deplete the divisible surplus in the sum of $9.08. The defendant company in the apportionment of its divisible surplus to the policies entitled to share therein, determined that it should pay dividends totalling $30.67 for the years 1931 to 1934 upon a policy for life insurance alone since it appeared that the premiums resulted in a contribution to the divisible surplus of that amount, and that upon policies like the plaintiff's, which provided exactly the same life insurance and, in addition, benefits in case of disability, the company should pay dividends totalling $21.59 for the years 1931 to 1934, or $9.08 less than the dividends paid on the policy for life insurance only, since it appeared that the total premium paid for life insurance combined with disability benefits resulted in a contribution to the divisible surplus of the company which is $9.08 less than the contribution resulting from payment of the lesser premium for life insurance only.

The declaration of a dividend upon a policy reduces *pro tanto* the cost of insurance to the holder of the policy. That is its purpose and effect. The plaintiff's grievance here is that though the defendant agreed to furnish life insurance for a premium of $27.34 and to furnish, in addition, disability benefits for an extra premium of $2.96, the plaintiff has been compelled to pay for the additional benefits promised to her, not only the extra premium of $2.96 but also, during the four years from 1931 to 1934, the difference between the dividends apportioned to her policy and the dividends which she would receive upon a policy identical with her own, except that it omitted the promise of additional disability benefits. That, we

are told, constitutes an inequitable apportionment, an unlawful discrimination and even, perhaps, a breach of contract.

The Insurance Law, section 83, requires, as we have said, that the divisible surplus of each insurance company shall be apportioned equitably to the " policies " it has issued. The plaintiff is asking that apportionment to her " policy " be made as if it were a combination of two separate agreements based on separate premiums. If a policy which provides life insurance combined with disability benefits constitutes but a single agreement given to the insured in exchange for a stipulated premium or payment, then indubitably the apportionment made by the company is equitable, for upon each " policy " the company then pays exactly the excess of the premium paid over the cost of furnishing the insurance and benefits promised by the policy. The plaintiff and other holders of policies which provide for disability benefits in addition to life insurance have no ground for complaint unless their policies are divisible into an agreement for life insurance made in exchange for a stipulated premium and a second agreement independent of the agreement for life insurance and made in exchange for a separate premium. Only if the defendant's agreement to provide disability benefits to plaintiff is entirely divisible from the other promises embodied in the policy and has been made solely in exchange for the payment of an extra premium of $2.96 entirely independent of other consideration, may the plaintiff and others similarly situated insist that any loss caused to the company by insufficiency of the stipulated premium to meet the cost of furnishing the promised benefits be borne by the company out of its general funds.

Under such a construction of the policies issued by the defendant, the plaintiff and other holders of policies which provide disability benefits would pay to the company less than the cost of the insurance and benefits

furnished, and to meet the deficit a minority of the defendant's policyholders who have a different form of policy would be required to pay more than the cost of the insurance furnished to them. The deficiency in the case of the plaintiff's policy is only $9.08, but it is plain that if the plaintiff's contentions are sustained the holders of the 1,600,000 policies which contain similar provisions will receive many millions of dollars of benefits beyond what they pay for. Neither the Insurance Law nor the terms of the defendant's policies dictate such a result.

It is true that the plaintiff's policy contains two promises which for some purposes and in some contingencies are separable. The promise of life insurance could be obtained without promise of additional disability benefits and for a premium or consideration fixed as the price of the promise of insurance alone; choice rested with the plaintiff whether the policy should include disability benefits for an extra premium, and choice still rests with the plaintiff whether the promise of additional disability benefits should be kept alive by the continued payment of the extra premium. The promise of life insurance would survive even if the promise of the additional benefits, and the extra premium demanded for the inclusion of that promise, should be excised from the policy. Though to that extent the promises are separable, they are none the less integral parts of a single policy.

The rules which govern the effect of a breach or of the illegality of one promise, which for some purposes is separate from other promises contained in the *same agreement*, have no application here. We are concerned solely with the question of whether the defendant's promise of disability insurance constitutes an *independent agreement* made in exchange for a *separate premium*, though embodied in a policy which contains other promises. Concededly the promise of the disability benefits could be obtained from the company only as

part of a policy of life insurance, and concededly it survives only so long as the policy of life insurance continues in existence. The test of the divisibility of a contract has been stated to be " whether the parties assented to all the promises as a single whole, so that there would have been no bargain whatever, if any promise or set of promises were struck out." (3 Williston on The Law of Contracts [Rev. ed.], § 863.) Since it is undisputed that the defendant would not have consented to the bargain for disability benefits unless it was made as part of a policy for life insurance, and since the provision for disability benefits can survive only as part of the policy, it is difficult to understand how the provision for disability benefits can be regarded as an independent agreement made in exchange for an independent consideration.

Policies of life insurance may contain different provisions for benefits based upon varying risks. The premium is always based upon a calculation of the anticipated cost of providing the promised insurance or benefits. We may reasonably assume that where one form of policy contains a promise of insurance or benefits which is not included in other forms, the premium provided for the policy containing the additional promise would include an extra premium for the additional promise even though the policy does not contain a statement to that effect. The premium fixed for a policy containing a number of promises might thus represent the sum of the amounts fixed by calculation of each factor of cost; nevertheless all the promises would be given to the insured in exchange for payment of the total premium. We may reasonably assume also that the choice of policy by an insured does not ignore the difference in the premiums demanded for each. Doubtless both the insured and the insurance company contemplate that the comparative amount of the premiums is the measure of the comparative cost of insurance. None the less when the divisible surplus is apportioned to all the policies, each

should receive the excess of premium over cost of furnishing the insurance, or, in other words, the amount it has contributed to the divisible surplus. Then a factor of risk and cost present in one policy and not in another may produce a great difference in the amount of the dividends which are apportioned to each and the comparative size of the premiums will have proved a faulty measure of the actual cost of the insurance.

The only possible distinction between such a policy and the plaintiff's policy lies in the circumstance that the plaintiff's policy states that "The total premium stated on the first page hereof includes an annual premium of $2.96 for Disability Benefits." This, it is said, constitutes an apportionment of the *total premium* which the policy on the first page exacts for the entire policy, and places upon the company an obligation to furnish disability benefits in combination with life insurance at a *cost* to the insured of not more than $2.96 in addition to the cost for the promised life insurance alone. In that connection, stress is laid upon the regulation of the Insurance Department which requires a separate statement of the amount of extra premium charged for the disability benefits, though apparently the parties did not consider the regulation sufficiently important to embody it in the agreed statement of facts. It is not clear that the statement in the policy or the regulation of the department has either the purpose or effect claimed by the plaintiff. The policy exacts a "total premium" for the totality of the promises of the company, and the statement that the "total" premium includes an "extra" premium for disability benefits serves to inform the policyholder of the manner in which the premium is made up and the amount by which the *premium* may be decreased if the policyholder desires life insurance alone. The provisions of section 83 that the divisible surplus of the company must be equitably

apportioned to each policy becomes part of every policy issued by the company. The premium represents merely the *estimated* cost of the policy. As the statement of facts shows, " The member pays that amount for the insurance in advance but later receives back such excess payment, if any, as a dividend, and thus gets the insurance at actual cost." The statute requires that. The policy so provides, and neither the insurance company nor the Department of Insurance could change that, and we may not assume that they have attempted to change that. The company has agreed to furnish life insurance combined with disability benefits for a " total " premium which includes an " extra premium " for the disability benefits. Promises and premiums are separable for some purposes, but the totality of the promises is given in exchange for the total premium. No promise of disability benefits alone could be obtained for the extra premium alone. The insurance company must carry out the promises it has made. It could not exact more than the stipulated total premium, even if that premium should be insufficient to meet the cost of furnishing the promised insurance. It must in addition return in the form of dividends any excess of the premium it may receive over that cost. It has done so in this case.

We have not overlooked the fact that the defendant company did not determine until 1931 that apportionment should be made in this manner, and that other companies still make other apportionment. The Insurance Law allows, as we have said, discretion in the manner in which apportionment may be made. So far as appears now, it may well be that both methods of apportionment lie within the range of that discretion.

The judgment should be affirmed, without costs.

CRANE, Ch. J. (dissenting). The Insurance Law of New York provides in section 83 for the distribution of surplus to policyholders. Every policy shall state that the proportion of the surplus accruing upon said policy

shall be ascertained and distributed annually, not otherwise. The section continues: " after setting aside from such surplus such sums as may be required for the payment of authorized dividends upon the capital stock, if any, and such sums as may properly be held for account of existing deferred dividend policies, and for a contingency reserve not in excess of the amount prescribed in this article, every such corporation shall apportion the remaining surplus equitably to all other policies entitled to share therein."

Section 89 relates to discriminations which are prohibited. " No life insurance corporation doing business in this state shall make or permit any discrimination between individuals of the same class or of equal expectation of life, in the amount or payment or return of premiums or rates charged for policies of insurance, including endowment policies and annuity contracts, or in the dividends or other benefits payable thereon, or in any of the terms and conditions of the policy; nor shall any such company permit or agent thereof offer or make any contract of insurance, endowment policy or annuity contract, or agreement as to such contracts other than as plainly expressed in the policy issued thereon; * * * nor shall any person knowingly receive as such inducement, any rebate of premium, or any special favor or advantage in the dividends or other benefits to accrue thereon, * * * not specified in the policy."

The question which we have to decide upon the agreed statement of facts is whether this law has been violated. The purpose of the statute, appearing upon its face, is to compel insurance companies to treat alike all who have the same kind of policy issued under the same or similar conditions.

On the 13th day of June, 1927, the New York Life Insurance Company issued a policy upon the life of Artrude L. Westerheide for $2,000, which was later split up into two policies of $1,000 each. For the purpose of

this opinion we shall deal with one of these two policies dated the 6th day of July, 1934. The policy is a contract, and we may assume that it complies with section 89 of the Insurance Law, in that the contract of insurance or agreement is plainly expressed in the policy and is none other. Thus in plain and simple language, the company agrees to pay $1,000 upon the receipt of due proof of the death of Artrude L. Westerheide, the insured, " and upon receipt of due proof that the Insured is totally and presumably permanently disabled before age 60, as defined under ' Total and Permanent Disability ' on the second page hereof, the company agrees to pay to the insured ten dollars each month and to waive payment of premiums, as provided therein.

" This contract is made in consideration of the payment in advance of the sum of $30.30, the receipt of which is hereby acknowledged, constituting the first premium and maintaining this policy for the period terminating on the thirteenth day of June, Nineteen Hundred and Twenty-eight, and of a like sum on said date and every twelve calendar months thereafter during the life of the insured until premiums for twenty full years in all shall have been paid from the date on which this policy takes effect."

On the second page of the policy are the provisions relating to total and permanent disability, the second paragraph from the bottom reading as follows: " The total premium stated on the first page hereof includes an annual premium of $2.96 for Disability Benefits."

The reason for this explanation or statement regarding the premium is a regulation of the New York Insurance Department which requires every policy containing disability benefits to include " a statement showing separately the amount of extra premium charged for total and permanent disability * * * benefits." I do not find this regulation within the agreed statement of facts, but it is referred to in the opinion of the Appellate Division and is contained in the appellant's brief, without any

contradiction from the respondent. We are justified, therefore, in saying that the insurance company was obliged by the regulations of the Insurance Department to specify in a policy of this nature the amount of the premium for the life insurance and the amount for the disability insurance.

Whether we consider the policy as one contract or as two contracts is entirely immaterial. The New York Life Insurance Company agreed to insure the life of Artrude L. Westerheide for $1,000 at an annual premium of $27.34, and also to furnish disability insurance on the terms therein stated for $2.96. During the period of the policy the company could charge neither more nor less than these premiums.

Included in the agreed statement of facts is a policy exactly like the one in question, with the disability feature omitted. In every respect it contains the same figures and agreements. It is called by counsel for convenience and for the sake of comparison and argument " the twin sister policy." It is issued to Mary Doe, insuring her life for $1,000, the premium being $27.34. All the provisions, conditions and privileges are the same. The table of loan values for each $1,000 is exactly in the same figures. The surrender values which are guaranteed are the same.

We, therefore, have a life insurance policy of $1,000 issued to the plaintiff (now Mrs. Rhine) in every respect the same as that issued of like kind, age and amount, without the disability feature.

Reading this policy in the light of these facts, the insured would naturally suppose — and would be justified in supposing — that under the Insurance Law of this State she would be treated alike in every particular, and that when the company annually divided its surplus, adjusting the amounts between its various classes of policies, she would, so far as life policies of her class were concerned, be given the same dividend. On the face of

the policy the premium of $27.34 related to the life insurance, and the premium of $2.96 paid for the disability benefits. The only way in which these two features of insurance were linked together is in the fact that they were included in the one policy. Although the company would not issue disability insurance unless the insured also took life insurance neither added nor subtracted anything from the other when once they were made.

The plaintiff by this action has questioned the division of the surplus to which she was entitled under the provisions of her policy and section 83 of the Insurance Law. She claims that it was inequitable. The policy contains a paragraph headed:

" PARTICIPATION IN SURPLUS — DIVIDENDS

" The proportion of divisible surplus accruing upon this Policy shall be ascertained annually. Beginning at the end of the second insurance year, and on each anniversary thereafter, such surplus as shall have been apportioned by the Company to this Policy shall at the option of the Insured be either

" (a) Paid in cash; or

" (b) Applied toward payment of premiums; or

" (c) Applied to purchase a participating paid-up addition to the sum insured (herein referred to as Dividend Additions); or

" (d) Left to accumulate at such rate of interest as the Company may declare on funds so held, but at a rate never less than three per cent compounded and credited annually. Such accumulated dividends (herein referred to as Dividend Deposits) may be withdrawn in cash by the Insured on any anniversary of the Policy or shall be payable at the maturity of the Policy to the person entitled to its proceeds.

. " If no option is selected, the dividend will be applied to the purchase of a dividend addition to the sum insured.

The Insured may surrender any dividend addition for cash at any time not later than three months after any default in the payment of premium, and the cash value thereof shall never be less than the original cash dividend."

The method of arriving at the surplus to be distributed in dividends to the policyholders is fully set out in the agreed statement of facts and may be briefly referred to as follows:

" Under the mutual plan, (a) all the members [or policyholders] pay their moneys into a common fund, the sums paid being based on age and the character of insurance desired; (b) the officers of the company manage the money as it is paid in, investing and reinvesting it; pay out the company's death and disability claims, matured endowments, surrender values, loans, taxes, expenses, etc.; set aside as an inviolable fund the Reserve (which is the amount required by law to be held for the future protection of members and which is calculated by pure mathematics to the exact dollar), and (c) what is left over (after setting aside sufficient funds to cover other liabilities, such as unpaid death and disability claims, etc., and other amounts properly held such as the Contingency Reserve) is returned to the members, from time to time, now generally annually, as their equitable share of the Divisible Surplus of the insuring company, which share so distributed to the members is commonly called a Dividend." (This is quoted from the agreed statement of facts.)

To continue: " The surplus of the New York Life has been created and accumulated by virtue of the premium payments made to it by millions of policy-holders in the forty-eight States of the Union, and in foreign countries. The fund so created is one general fund created by all the policy-holders, and each policy-holder is entitled to his equitable share of the Divisible Surplus and in such Divisible Surplus the equitable share of policy-holders of the same ' class,' must be determined by precisely the same methods, principles and factors.   *   *   * "

The ascertainment of the amounts which must be deducted from the premiums received in order to ascertain a surplus or a divisible surplus is a matter for the actuaries. The parties have agreed in stating it thus: " The ascertainment of the average ratios of Mortality, Disability, Expense, Interest, Surrender and Lapse (which the New York Life applied to each of said '.classes ') and the application thereof, involved a consideration of millions of items, and of many difficult and conflicting factors which have been determined by mathematical principles of great complexity. In ascertaining many of the elements going to compose those factors, it was necessary that determinations and decisions should be taken with respect to various facts, concerning which there might be a legitimate and honest difference of opinion between different companies and their various actuaries, and concerning the mathematical formulas to be used." The plan of mutual life insurance is stated in a word to be " the member pays that amount for the insurance in advance but later receives back such excess payment, if any, as a dividend, and thus gets the insurance at actual cost."

Perhaps for the purpose of this opinion I can summarize that which has been set forth at length and in detail. The only income that a mutual insurance company has is from the premiums on its policies and the investment of the funds. The premiums more than pay for the insurance. The amount of premium is determined by tables of experience covering long periods of years and many individuals of like age with similar policies. In a word, the company first determines by these mortality tables or disability tables what the premium should be to cover any given insurance and be on the safe side. The result is that the premium more than pays for the insurance and the risk, for the reason that the elements entering into the calculation exceed the actualities. Thus not so many people have died within a certain period as had been figured; not so many losses, therefore, have to

be paid as had been calculated. The interest upon investments is generally more than had been assumed.

We are not particularly interested in the way in which the surplus is determined. Sufficient for this case that there is a surplus, a large surplus, from which the company is bound to take out certain reserves, as they are called, to cover future liabilities. After these and all expenses, including the contingency reserve permitted by section 87 of the Insurance Law, have been deducted, we have at last a divisible reserve which is to be paid back to the policyholders. The method used to determine the amount which each policyholder should receive is a matter for the actuary as the policyholders are necessarily divided up into various classes, dependent upon age and nature of the policies.

The distribution of the divisible surplus is made according to the " contribution method." The fundamental characteristic of the contribution method is that it relates the distribution of divisible surplus to the various sources from which such surplus is derived so that the company returns its divisible surplus to its policyholders (as dividends) in the proportions in which each policyholder has contributed to the creation of such surplus. These brief references I am sure will suffice for the points which must be considered. The method for arriving at the divisible surplus and the complicated but no doubt very fair contribution method whereby each policyholder receives a dividend proportioned — practically proportioned — to the amount he has contributed, are matters which we must assume have been properly applied in these cases. What the divisible surplus shall be is a matter for the insurance companies and their boards of directors under supervision of the Insurance Department, without interference from the courts. (*Greeff* v. *Equitable Life Assur. Society*, 160 N. Y. 19.)

The only question which we must determine on the facts here presented is whether the divisible surplus having been ascertained the plaintiff got her share;

whether she has been equitably treated, which means that we must determine whether she has received less than others of her same class having policies of like age and nature, or, to put the question in another form, whether the insurance has cost her more than agreed.

The parties concede that if it were not for the disability provisions in her contract the plaintiff would have received for the last four or five years increased dividends.

Commencing with 1919, and continuing through the calendar year 1930, the company without exception paid the same dividends in dollars and cents per one thousand face amount of insurance on all otherwise similar life insurance policies, regardless of whether or not there had been issued in connection with them and were outstanding disability benefits. During this period there were heavy losses from the disability insurance. The premiums which the company had charged for the disability branch of the business had not covered its liabilities and, during the ten years in which these losses occurred, the company had treated these losses just the same as it had other losses of management. It reduced the total amounts paid as dividends and equitably distributed its disability losses among all policyholders, regardless of whether their policies contained disability benefits. It did not compel the holder of a policy containing disability benefits to pay more than the disability premium for the disability benefits, even though the cost to the company of the disability benefits was in excess of such premium. Of course it could not change its outstanding contracts in this particular.

Since 1931, however, the company has compelled every holder of a policy with disability benefits to pay the full difference between the average cost to the company of such disability benefits and the disability benefit premium specified in his policy. Payment of this additional amount has been exacted from him by deducting it from the dividends payable on the life insurance in his policy. In the

agreed statement of facts we have the following: "The New York Life applied to Mrs. Rhine's policies, and all other similar policies with Death and *with* Disability Benefits, exactly the same factors as it applied to all similar policies issued in the same year, at the same age, with Death but *without* Disability Benefits,— except in the *one* single particular, to wit: the Company applied the Disability factor to Mrs. Rhine's 'group,' but it *did not apply* the Disability factor to policies *without* Disability Benefits."

The disability factor represents the estimated losses which from that time on were charged up or against the life policies containing the disability provisions in estimating dividends. These losses were not taken into consideration in calculating the dividend on policies of similar nature not having the disability insurance. This resulted in the plaintiff receiving a lesser dividend on her life policy than she would have received if the disability feature had not been a part of it. The explanation is given in the following words taken from the agreed statement: "Beginning in 1931, the Directors and Officers of the New York Life became convinced that although the premiums received by the Company, over a series of years for the Disability Benefits in its life insurance policies, exceeded the actual cash disbursements on account of disabled policyholders, such provisions were not contributing to the Surplus; and in the exercise of their reasonable and best judgment they decided that while the experience of the prior eleven years (1920–1930) was not conclusive, they should no longer continue to use a *zero* factor; and, therefore, they decided that the New York Life should use, and thereafter it did use, a *negative* Disability factor in the ascertainment and apportionment of Divisible Surplus among those Death Benefit policies containing Disability Benefit provisions which were a drain upon the Surplus of the Company."

The *zero* factor and the *negative* factor may be described by their results. Although the disability losses existed

between 1920 and 1930, the company apparently treated these losses, in arriving at its divisible surplus, the same as any other losses, that is, they were classed with expenses, costs and other deductible elements; treated as a general loss to be borne by the company as a whole. The remaining divisible surplus was apportioned equitably among both the disability and non-disability policyholders. Beginning with 1931 the company used the negative factor, which in result meant, as above stated, that the disability losses were charged up solely to the disability policyholders, those who had the life and disability policies.

From 1920 to 1930, inclusive, the New York Life paid to the holders of policies containing life insurance and disability benefits the same dividends in dollars and cents per one thousand dollars face amount of life insurance as on all other identical life insurance agreements. Since 1931, holders of policies with disability benefits of the type involved in this action have been receiving less in dividends than holders of exactly similar life insurance agreements in policies which do not contain disability benefits. The net difference is produced by the use of the so-called " disability factor " which measures the difference between the cost to the company of the disability benefits and the premium collected for such disability benefits.

The result in figures, as applicable to the plaintiff's policy, is this: The premium paid for life insurance from 1931 to 1934 was $27.34 each year. The dividend received in 1931 was $6.60; in 1932, $5.35; in 1933, $4.82; in 1934, $4.82; total, $21.59. The dividend on a similar policy, without the disability insurance, was or would have been, in 1931, $7.35; in 1932, $10.08; in 1933, $6.62; in 1934, $6.62; total, $30.67. The difference is $9.08. If the plaintiff had not taken the disability insurance she would have received in these years $9.08 more.

It is conceded by counsel that if she had discontinued the disability insurance at any time she would thereafter

have received these additional amounts as dividends on her life policy. She would not have received the same amounts, but the disability factor would not have been applied, and she would have received the same dividends as other life policyholders without disability insurance. In other words, when she dropped the disability insurance her dividend returns went up. Whether we consider this as an inequitable distribution of the divisible surplus or as an extra charge to the plaintiff for disability insurance is entirely immaterial. The words mean nothing; the reality is apparent. Because the plaintiff had disability insurance along with her life policy she either gets less money as a return premium on her life policy, or is charged more for her disability insurance. The former violates the Insurance Law, which is part of her contract; and the other increases her premium, contrary to the terms of the contract. Whichever way we look at it the defendant has failed to keep its contract.

Bear in mind that our Insurance Law expects the endowment policy plainly to express the contract. We have said in this court many times that policies of insurance are contracts to be interpreted like any other agreement. This policy insured the plaintiff's life for $1,000 at a premium of $27.34; it also gave her disability insurance for $2.96. Unless these figures meant something the regulations of the Insurance Department were meaningless. The company was required to state the premium for each kind of insurance so that people would know what they were paying for and what it was they were to get. If this premium of $2.96 can be increased so as to amount in four years to $9.08, why state any figure at all? It was a useless formality leading to misunderstanding. We must take the policy as it reads. The disability insurance, whether profitable or unprofitable, was to be furnished, as therein stated, for $2.96, and the premium could not be increased, directly or indirectly. It could not be raised directly by increased premium for disability, neither could it be raised indirectly by changing

the terms of the life policy. That life policy for a premium of $27.34, read in conjunction with section 83 of the Insurance Law, gave to the plaintiff the $9.08 which other like policyholders received as dividends or return premiums. This is the equality required by that section. In his supplemental brief the attorney for the defendant says: "Of course the New York Life is obligated to supply the Disability Benefits;— but it is not obligated to supply them for a premium of *$2.96* annually." This is the whole question, the answer to which settles the controversy. I disagree with counsel and hold, for the reasons stated, that such is the obligation.

The reason suggested by the defendant for the inequality is the fact that the disability insurance is printed upon the same paper as the life insurance policy, and that such form of policy creates a class by itself; in other words, that a life policy, identical with others, becomes different in nature and class because it also contains disability insurance complete in terms to be furnished for $2.96 as a premium.

The company and its agents failed to inform the plaintiff that her life policy was any different in any of its features than other similar life policies, or, that because of the disability feature, she might receive less return premium. The probability of return premiums is always considered in figuring the cost of mutual policies. The stated premium is supposed to be reduced, as in the past, by a certain amount of return premium — a division of the surplus. If this is to be less in life policies carrying disability insurance than in those without the disability feature, then in fairness it should be so stated.

The amount involved in this submitted case is small, but the defendant has called our attention to the large sums which may ultimately be dependent upon our decision. Such considerations may cause us to ponder well before arriving at a conclusion but must not modify a contract clearly expressed and intended to comply with the Insurance Law.

The judgment of the Appellate Division should be reversed, and judgment directed for the plaintiff, in accordance with the stipulation of the parties. No costs.

O'BRIEN, HUBBS, CROUCH and LOUGHRAN, JJ., concur with LEHMAN, J.; CRANE, Ch. J., dissents in opinion, in which FINCH, J., concurs.

Judgment affirmed.