No. 35,940

ERNEST S. PRATT, *Appellant*, v. THE MUTUAL LIFE INSURANCE COMPANY OF NEW YORK, *Appellee*.

(145 P. 2d 113)

Opinion filed January 22, 1944.

*Charles E. Jones,* of Wichita, argued the cause, and *Mark H. Adams* and *J. Ashford Manka,* both of Wichita, were on the briefs for the appellant.

*William Marshall Bullitt,* of Louisville, Ky., argued the cause; *Robert C. Foulston, George Siefkin,* both of Wichita, *Louis W. Dawson,* of New York City, and *Henry I. Eager,* of Kansas City, Mo., were on the briefs for the appellee.

The opinion of the court was delivered by

SMITH, J.: This is an action to recover money and for injunctive relief. Judgment was for the defendant. Plaintiff appeals.

After the formal allegations, the petition alleged that on November 19, 1927, while plaintiff was a resident of Oklahoma, and relying on representations of defendant's agents, he made application for an ordinary life insurance policy with double indemnity for death by accident and increasing total and permanent disability benefits; that on November 25, 1927, an ordinary life policy was issued to plaintiff by which defendant insured the life of plaintiff for $5,000 or $10,000 for accidental death and agreed further that if plaintiff became totally and permanently disabled before becoming sixty years of age to pay him $50 per month. The petition then referred to a provision in the policy, as follows:

"The share of the divisible surplus accruing on this Policy shall be alloted as a dividend annually on each anniversary of its date, the first such dividend being payable only if any premium due on the first anniversary be duly paid."

The petition then alleged that for a long time prior to the issuance of the policy defendant's agents, being duly authorized to do so, made statements to plaintiff that of the total premium to be paid on this policy $115.70 was for ordinary life, $5 was for double indemnity and $17 was for disability; that these amounts were more than the actual cost of the insurance and each year there would be dividends to be disposed of at the option of the plaintiff; that if plaintiff would permit these dividends at the rate defendant was then paying to be retained by the company, plaintiff's policy would be paid up in twenty-three years; that the annual dividend would be determined from the profits on all ordinary life policies (whether containing disability or double indemnity benefits or not); that defendant furnished to its agents a booklet, which purported to show the results of paying the dividends in cash or permitting them to be retained by the company and that this booklet classified ordinary life policy contracts with and without disability benefits in the same class. The petition then alleged that from the time plaintiff's policy was issued until 1937, defendant made no distinction in the determination of dividends from its divisible surplus between ordinary life policies with the special benefits and those without them, and each year from 1929 to 1936 it credited plaintiff with dividends of never more than $39.94 and never less than $30.22; that for the

years 1937 to 1939, inclusive, the defendant credited plaintiff's policy with dividends as follows: For 1937, $18.80; for 1938, $16.27; for 1939, $7.60, or a total of $42.67, while for the same years the dividends credited to policies without disability benefits amounted in the aggregate to $85. The petition alleged further that in December, 1939, plaintiff was advised that defendant had introduced into its actuarial calculations a new disability factor and had made a distinction between ordinary life policies with disability benefits and those without disability benefits. The petition then alleged that this action on the part of the defendant was without notice to or consent of plaintiff and in violation of the contract and the representation made by defendant already alluded to in this opinion and caused plaintiff to pay an additional premium to defendant in the sum of $42.32 for those years and plaintiff had been advised by defendant that it would continue to use that method of calculation in the future for the determination of dividends on his policy unless enjoined. The petition further alleged that defendant had advised plaintiff that if he would cancel the disability benefit provision of his policy he would be credited with dividends at the same rate as was credited on other policies without disability benefits; that defendant was solvent and able to pay dividends on plaintiff's policy according to the contract; that the actual result of defendant's acts was to increase the rate on plaintiff's policy in violation of its terms; that plaintiff desired to keep the policy in force as it was written, and that if defendant was permitted to discriminate against him in the allocation of dividends, plaintiff would suffer irreparable loss; that he had no adequate remedy at law and the district court by taking equitable jurisdiction of the case would prevent a multiplicity of suits. The prayer of the petition was that defendant be enjoined from determining dividends on the policy in such a manner as to discriminate against plaintiff and in violation of the contract, for judgment against defendant in the sum of $42.32 and for other equitable relief.

The first defense pleaded in the answer was a specific denial of each allegation of the petition amounting in reality to a general denial of everything except that the policy was issued to the plaintiff and that a change had been made in the method of computing the amount of dividends to be credited on plaintiff's policy.

For a second defense, the answer pleaded an action in the name of William H. Ellis and others similarly situated against this defend-

ant wherein the court of last resort of the state of Alabama held that the courts of New York, not those of Alabama, had power to supervise the action of this defendant in appropriating its dividends to policyholders. The answer pleaded that this judgment was entitled to full faith and credit by the courts of this state and if that was given it would require the dismissal of this action.

For a third defense, the answer pleaded that the cause of action involved questions relating to the internal affairs of the defendant; that they were all governed by the laws of New York over which the government and the courts of New York had exclusive jurisdiction and that the defendant had returned to its policyholders the surplus of the company in proportion to the contribution which the policies had respectively made to it; that for fifty years or more in the ascertainment of the distribution of its surplus the defendant had employed a calculation which was set out in detail in the answer.

For a fourth defense, the defendant pleaded that the matter of apportionment of its divisible surplus was solely a matter of its own internal affairs and by the laws of New York was vested in its board of trustees and that to grant the relief prayed for in the petition would require this court to interfere with the internal management of the affairs of defendant and with the rights of its policyholders, which in the interest of uniformity and practical determination should properly be determined by the courts of New York, and the courts of Kansas had no jurisdiction to entertain the suit or to grant the relief sought by the plaintiff. The prayer of the answer was that full faith and credit be given to the proceedings in *Ellis v. Mutual Life Ins. Company of New York*, 237 Ala. 492, 187 So. 434, and especially to the determination in that court in that representative action on behalf of all holders of policies issued by the Mutual Life Insurance Company containing a provision for disability benefits; that the defendants had properly classified its policies with respect to the ascertainment and apportionment of the divisible surplus with respect to policyholders with death benefits only and the holders of exactly similar policies except that the latter had provisions for disability income benefits; that the principles and methods of distributing its divisible surplus be ratified and confirmed and that the action be dismissed for lack of jurisdiction and on its merits.

For reply the plaintiff denied generally all the allegations of the answer and specifically that the decision in the case of *Ellis v. Mu-*

*tual Life Ins. Company of New York*, 237 Ala. 492, 187 So. 434, was entitled to full faith and credit. The reply further alleged that the laws of New York had no application to issues before this court; that the laws of Oklahoma, where the contract was made, or the laws of Kansas, where the plaintiff resided and the place where the action was brought, governed the construction and meaning of the contract; that in the event the court should hold that the statutes of New York controlled in determination of the case plaintiff alleged that the law as interpreted by the court of appeals of New York in *Rhine v. New York Life Insurance Company*, 248 App. Div. 120, affirmed 273 N. Y. 1, was contrary to the policy of the states of Oklahoma and Kansas and was unconstitutional and void.

With the issues thus drawn the case proceeded to trial. There was some evidence offered by the plaintiff, the objection to a portion of which was sustained by the trial court. That will be noted presently in this opinion. In addition to that, the plaintiff offered certain portions of a stipulation as to the facts. When the defendant introduced its evidence it offered the entire stipulation of facts, a lengthy document. The plaintiff objected to this stipulation on the ground that many of the facts were irrelevant. The court admitted it and we have the benefit of it in considering this appeal.

The court made findings of fact to the effect that on the 25th day of November, 1927, the defendant, upon application, issued to plaintiff in Oklahoma a whole life policy with double indemnity for death by accident and increased total permanent disability benefits; that the soliciting agent of defendant in negotiating with the plaintiff for the purchase of the policy showed him a booklet, which was published by defendant, purporting to estimate the dividend results on the type of policy which plaintiff purchased, as well as on other policies (this booklet is a part of the stipulation as to the facts) that plaintiff relied upon it in making his application; that defendant did in fact from 1913 to 1936, inclusive, pay exactly the same dividends on policies with and without disability benefits; that during the years 1937 to 1939 defendant paid a much smaller dividend in dollars and cents per $1,000 face amount of the policy on plaintiff's policy with disability benefits than it paid in dollars and cents upon policies exactly similar to plaintiff's policy except that they did not contain any provision for disability benefits; that for the three years, 1937, 1938 and 1939 this difference amounted to $48.35, but that plaintiff's policy possessed the benefits which the holders of policies without disability benefits did not possess. The court

further found that the defendant was a mutual life insurance company without capital stock with its principal office and place of business in New York; that defendant during all the time the policy was issued was making a profit on its policy contracts and had created a surplus of one general fund which was at all times more than adequate to pay any losses sustained on the disability benefits provided in the policy; that defendant followed the same principles in the distribution of its divisible surplus among its policyholders that all other mutual insurance companies followed. The court made conclusions of law, as follows:

"1. The policy of insurance under consideration is a single contract with both death and disability benefits so interwoven as to constitute a single integral insurance contract.

"2. The defendant's apportionment of its divisible surplus to the plaintiff and the group which he represented is equitable.

"3. Judgment should be for the defendant."

Judgment was entered pursuant to those findings and conclusions —hence this appeal.

During the trial of the action the plaintiff offered to testify that the soliciting agent for the defendant advised him that he would have ordinary life benefits, increasing disability benefits and special death benefits in this policy, and that while he would have to pay a separate premium on each of these he would receive annually the same dividends on his policy as would be paid on a similar policy issued only on an ordinary life basis, and that if his dividends were permitted to remain with the company his policy would be fully paid approximately in a period of from twenty-two or twenty-three years; that it was in reliance upon these representations and other representations contained in Exhibit 4 that he purchased the policy; that it was his intention in his original negotiations with the agent to purchase the type of policy that would be paid up in a period of about twenty years and that after the discussion just referred to with the agent he decided to purchase an ordinary life policy with special benefits. The objection of the defendant to the introduction of this testimony was sustained. The action of the trial court in sustaining this objection is the first specification of error raised by the plaintiff in this appeal. That specification is argued together with others in the brief of the plaintiff. It should be noted at the outset that Exhibit 4, referred to by the plaintiff in his offer of proof, was the booklet containing illustrations of dividend results, to which reference has already been made in this opinion.

Plaintiff argues that he should have been permitted to testify as outlined in the offer of proof and that had he done so it would have compelled a finding by the trial court that the booklet, together with the representations of the agent of defendant, constituted a part of the policy and that since the booklet showed that policyholders of defendant who would receive the special benefits in their policies had been paid for many years the same dividend as policyholders who did not receive these special benefits, and that since it appears from the record that for some years after this policy was taken out the two classes of policies continued to pay the same dividend, the defendant was bound to continue that practice. The plaintiff argues that while it is true that the booklet did not purport to represent that a certain dividend would be paid it did clearly represent that whatever annual dividend was paid it would be the same on both policies with or without disability benefits.

The solution of this question requires an examination of this booklet and the court's findings and the agreed statement of facts. In the agreed statement of facts it is stipulated that the booklet was placed in the hands of soliciting agents of the defendant and that this booklet was exhibited to plaintiff at the time he applied for his policy and that he examined the statements contained in it and relied upon them.

The court, as has been noted, found as a matter of fact that the booklet was shown to plaintiff and the plaintiff studied it and relied upon it. In the stipulation, as has been heretofore noted, it was also agreed that for the years from 1913 to 1936 the same dividend had been paid on both types of policies. In view of those findings, the question resolves itself into: To what extent plaintiff was entitled to rely upon this booklet and whether or not plaintiff's evidence as to representations made by the agent of defendant with reference to the booklet was competent.

In this connection we shall first examine this booklet. On the cover page we find that its title is "Illustrations of Dividend Results" in rather large print. At the bottom of the cover page is the statement "This leaflet issued for instruction of agents." On the third page appears the statement "This leaflet gives accumulated dividend illustrations for policies on the following plans." Then follows a tabulation of the different forms of policies issued by the company. After this tabulation appears the following statement:

"The dividends on which these tables are based are those of the 1927 scale,

and since there is no assurance that this dividend scale will continue without change for the several periods indicated, these figures are in no sense estimates of results under policies now being issued, because any increase or decrease in future dividend scales will correspondingly increase or decrease the figures given. It must be clearly understood that the results shown herein are not to be used as a basis for any promise or guarantee on the part of the Company or its representatives."

The fifth page contains a copy of a section of the statutes of New York, which makes it a criminal offense, amongst other things, for the agent of an insurance company to misrepresent a policy. The following pages give the actual dividend per $1,000 insurance for different types of policies based on the 1927 annual dividend scale. The second line at the top of each page is the following:

"Any increase or decrease in future dividend scales will correspondingly increase or decrease the figures given."

It is true, as pointed out by the plaintiff, the figures show the same rate of dividend for the policies with special benefits as it shows for those without special benefits. Had plaintiff read the whole book he would have noted on the cover page the statement that the figures in it were illustrations, not representations. Had he read on he would have noted on the third page the positive statement that the results shown were not to be used as a basis for any promise or guarantee on the part of the company. It may be said that plaintiff saw only those pages of the booklet that contained the figures applying to the policy for which he was applying. In this event he is met by the statement that appears at the top of each page to the effect that any increase or decrease in future dividend scales would correspondingly increase or decrease the figures given. The effect of admitting the evidence offered would be to permit plaintiff to take the position that he was only bound to notice the statements and figures in the booklet that are favorable to his case. We cannot do that. A final answer to this question depends on provisions of the policy. The last paragraph of section 14 of that document provides as follows:

"NOTICE.—No agent or other person except the President, Vice-president, a Second Vice-president, or a Secretary of the Company has power on behalf of the Company to bind the Company by making any promises respecting benefits or accepting any representations or information not contained in the written application for this Policy, or to make or modify this contract, or to extend the time for payment of a premium, or to waive any lapse or forfeiture or any of the Company's rights or requirements."

There is a provision in substantially the same words in the application for this policy which was signed by the plaintiff. While it might be said that the plaintiff would accept the policy without having read all of its provisions, it is difficult to say that he was not bound by a statement of this sort in the application, especially since the application itself provided that it be considered as part of a contract between the parties. This court has many times considered cases where the insured relied upon oral representations claimed to have been made by the agent to him at the time the application was made or the policy delivered. In *Musgrave v. Equitable Life Assurance Society*, 124 Kan. 804, 262 Pac. 571, the policy provided that it should not be effective unless it was delivered to the insured while he was in good health. The agent in that case attempted to deliver the policy to the wife of the insured, who was the beneficiary, after he became sick and was in the hospital. This court held as follows:

"Where an application for a life insurance policy provides that it shall not take effect until the first premium has been paid during the good health of the insured and that no agent shall have any right to waive any requirements, and the agent attempts against definite instructions to put it into effect by delivering it to the wife of the applicant, knowing that the applicant is sick and in the hospital at the time, the insurance company will not be deemed to have waived its right to the defense of lack of good health at the time of such delivery." (Syl. ¶ 1.)

In *Klein v. Farmers & Bankers Life Ins. Co.*, 132 Kan. 748, 297 Pac. 730, the court dealt with the same situation and held to the same general effect.

· See, also, *Supica v. Metropolitan Life Ins. Co.*, 137 Kan. 204, 19 P. 2d 465, where the question decided was the authority of the agent to accept less than the amount of premium that was specified in the policy. This court held:

"Where an insurance policy provides in plain and unambiguous language that the premium on the policy shall be payable semiannually, the payment to the soliciting agent of the company of an amount less than the semi-annual premium provided in the policy does not operate to keep the policy in force." (Syl. ¶ 1.)

See, also, *West v. Metropolitan Life Ins. Co.*, 144 Kan. 444, 61 P. 2d 918; *Stephan v. Mutual Benefit H. & A. Ass'n*, 146 Kan. 307, 69 P. 2d 694, and *Nixon v. Manhattan Mutual Life Ins. Co.*, 153 Kan. 39, 109 P. 2d 150.

These cases all sustain the position that an agent does not have

authority to waive the provision of an insurance contract to make an oral contract contrary to the terms of the policy or to change the terms of the written contract.

We hold, therefore, that the court did not err in refusing to admit the proffered testimony of the plaintiff as to the representations the agent of defendant made to him with reference to the dividends to be paid on the policy in question.

The plaintiff asked the trial court to enjoin the defendant from determining dividends on plaintiff's policy in such a manner as to discriminate against plaintiff and in violation of plaintiff's contract. It is conceded that the domicile of defendant is in New York. The granting of the relief sought would require this court to exercise the power of visitation over a corporation of another state. In *Boyette v. Preston Motors Corp.*, 206 Ala. 240, 89 So. 746, the action was in Alabama by a shareholder in a Delaware corporation to compel the issuance of stock to the complainant. On the question of the jurisdiction of the court to entertain the action, the court said:

"The many authorities bearing upon the question are to the effect that courts of one state have no jurisdiction to exercise visitatorial or supervisory powers over the management of the internal affairs of a corporation organized and domiciled under the laws of another·state, such powers belonging to the state in which the corporation was created, and by which it is continued in life. As a corollary of such rule, state courts have no jurisdiction to interfere by injunction, mandamus, or otherwise in the management of the internal affairs of a foreign corporation at the suit of a resident stockholder, even though the corporation may maintain an office and place of business in the state, and may, expressly or impliedly, agree to submit to the jurisdiction of the court in suits against it."

In *Smith v. Mutual Life Insurance Company of New York*, 14 Allen (Mass.), 336, the court held, in effect, state courts, other than in the state in which a corporation is created, have no jurisdiction to exercise authority over the organization, the corporate functions, the bylaws, the relations between the corporation and its members, or to determine the rights and obligations of the corporation or its members arising under the law of its creation, such questions or matters depending on local law.

See, also, annotation in 18 A. L. R. 1376.

Many courts have considered the question of what are internal affairs of a company over which a court of another state will not exercise jurisdiction.

In *North State Copper and Gold Mining Co. v. Field*, 64 Md. 151, 20 Atl. 1039, in speaking of this question, the court said:

"It may not be in all cases easy to draw a clear line of distinction between the acts of a corporation relating to its internal management, and those which do not. But we apprehend the distinction to be this: That where the act complained of affects the complainant solely in his capacity as a member of the corporation, whether it be as a stockholder, director, president, or other officer, and is the act of the corporation, whether acting in stockholders' meeting, or through its agents, the board of directors, that then such action is the management of the internal affairs of the corporation, and in case of a foreign corporation, our courts will not take jurisdiction. Where, however, the act of the foreign corporation complained of affects the complainant's individual rights only, then our courts will take jurisdiction, whenever the cause of action arises here."

See, also, *Kelly v. Thomas*, 234 Pa. 419, 83 Atl. 817.

There is every reason why the rule above stated should prevent a court in this state from issuing the injunction prayed for here. The very nature of the business of mutual life insurance companies requires this. The statutes of New York require that the apportionment of the divisible surplus shall be equitable. (See Ins. Laws of New York, ch. 30, sec. 83.) It is conceded in the stipulation as to the facts that a calculation of the dividends to be paid on any one policy requires a taking into account of the amount contributed to the divisible surplus under every policy. A rule that would permit the courts of this state to issue the injunction prayed for would make it necessary for the company to operate subject to the rules laid down and orders made by courts in each of the forty-eight states. This would create an impossible situation.

The conclusion that has been reached on the above question makes it unnecessary to discuss the question of whether full faith should be extended to the judgment in *Ellis v. Mutual Life Ins. Company of New York*, 237 Ala. 492, 187 So. 434.

The judgment of the trial court is affirmed.

HARVEY, J. (dissenting): The question in this case is, what was the contract between the insured, plaintiff here, and the insurer? Concededly, the contract is evidenced by the application and by the policy. The real question is, what does the policy mean with reference to its classification for the payment of dividends? It does not provide how policies are classified for computing dividends to be paid to the holders of various kinds of policies issued by the insurer. The insurer prepared and furnished its soliciting agent with a booklet explanatory of how its policies were classified with respect to the payment of dividends. It is true it represented the experience of

the insurer up to a certain date, and it was not a guarantee or warranty that the dividends in the future would be the same in amount. It did, however, explain how the insurer classified its policies with respect to dividends. This classification shows that ordinary life policies carrying special benefits for which an extra premium was charged were classified with respect to the payment of dividends as similar policies without such special benefits. It carried the statement: "Any increase or decrease in future dividend scales will correspondingly increase or decrease the figures given." That was the only change suggested for the future. The figures given were based on the 1927 annual dividend scale. One reading this could not help but understand the dividend scale after 1927 might be increased or decreased so far as the amount paid in dividends was concerned, but there was no intimation anywhere in the booklet that the types of policies would be reclassified with respect to dividends. In fact, the representations contained in the booklet were to the contrary—that they would be uniform. This was not a change in the policy; it was simply explanatory of what the policies provided. The court found that this booklet was exhibited by the agent of the insurer to plaintiff and that plaintiff read it, understood it and relied upon it. In other words, the contract represented by the policy issued to plaintiff and his application were understood by plaintiff to provide that the dividends upon his policy carrying special benefits would be the same as those upon a similar policy which did not carry those benefits. I think it clear that the insurer intended that he should so understand it. It is also clear that the insured so understood it. In fact, that point upon which the minds of the contracting parties apparently met at the time of the issuance of the policy was carried out for ten years by the insurer, and used by the insured to purchase additional insurance, as authorized by the policy. His right to do so was recognized by the insurer.

This question was not presented nor decided by the court in *Ellis v. Mutual Life Ins. Co. of New York*, 237 Ala. 492, 187 So. 434. Neither was the question raised nor decided in any of the fifteen opinions: *Uhlman v. New York Life Ins. Co.*, 109 N. Y. 421, 17 N. E. 363; *Greeff v. Equitable Life Assur. Society*, 160 N. Y. 19, 54 N. E. 712; *Equitable Life Assurance Soc. v. Brown*, 213 U. S. 25; *Miller v. New York Life Insurance Co.*, 179 Ky. 246, 200 S. W. 482; *Maddox v. Mutual Life Ins. Co.*, 193 Ky. 38, 234 S. W. 949; *Pittsfield Bank, etc., Co. v. Equitable Life* (Mass. [Dist. Ct.] 1934);

*Rhine v. New York Life Ins. Co.*, 248 App. Div. 120, 289 N. Y. S. 117; *Rhine v. New York Life Ins. Co.*, 273 N. Y. 1, 6 N. E. 2d 74; *Rubin v. Metropolitan Life Ins. Co.*, 278 N. Y. 625, 16 N. E. 2d 293; *Sullivan v. Penn. Mut. Life Ins. Co.*, 100 F. 2d 560; *Barnett v. Metropolitan Life Insurance Co.*, 258 App. Div. 241, 16 N. Y. S. 2d 198; *Barnett v. Metropolitan Life Ins. Co.*, 285 N. Y. 627, 33 N. E. 2d 554; *Blackburn v. Home Life Ins. Co.*, 19 Cal. 2d 226, 120 P. 2d 31; *Maynard v. Mutual Life Ins. Co.* (Tenn. 1942), 165 S. W. 2d 385, cited and relied upon heavily by appellee in support of the trial court's judgment, which opinions appellee has printed in full for the convenience of the court.

Counsel for appellant cite *Forman v. Mutual Life Insurance Co.*, 173 Ky. 547, 191 S. W. 2d 279; *Noel v. Continental Casualty Co.*, 138 Kan. 136, 23 P. 2d 610; *Fuller v. Metropolitan Life Ins. Co.*, 37 Fed. 163, and *Southern Mutual Life Insurance Company v. Montague*, 84 Ky. 653, 2 S. W. 443, in support of their contention that the illustration from the booklet issued by the insurer and shown plaintiff at the time he made application for the policy in question, and which shows that the dividends were computed at the same rate as dividends on similar policies without special benefits, was explanatory of the policy and should be read with it. The cases cited tend to sustain that view. Counsel for appellee contend that the Forman case has been "distinguished and practically repudiated" by later decisions of the Kentucky court of appeals. I agree the later decisions distinguish the case, but not that they repudiate it. In fact, they seem to make it clear that is not being done. The Forman case was cited and followed in *Thomas v. Life Assurance Society*, 198 Mo. App. 533, 205 S. W. 533, and more recently cited with approval in *Automobile Underwriters, Inc., v. Camp*, 217 Ind. 528, 27 N. E. 2d 370-373.

The principle contended for by appellant is sustained in *Rasmussen v. New York Life Ins. Co.*, 267 N. Y. 129, 195 N. E. 821. The policy there involved contained a provision for double indemnity in case of death by accident, but further provided:

"Double indemnity shall not be payable if the insured's death resulted from . . . the taking of poison or inhaling of gas, whether voluntary or otherwise."

The court said: "Unless ineffective for reasons in the record, this exception defeats plaintiff's recovery," citing *Osburn v. Commercial Traveler's Mut. Acc. Assn.*, 265 N. Y. 671, 193 N. E. 438. At the

trial plaintiff offered in evidence a pamphlet which had been enclosed and delivered with the policy. An objection to that was sustained and the case dismissed. The policy was dated in 1928. The pamphlet was entitled "1927 in a Nutshell. . . . Printed by the New York Life Insur. Co., N. Y. city." It reads in part:

"'*Double indemnity for accidental deaths.* Experience of the New York Life in 1927, the tenth year of this feature. Double indemnity added $1,983,060.01 to the amounts otherwise payable. Who can say that this feature is not valuable? Causes of death: . . . Carbon Monoxide, 16 . . .'"

Plaintiff testified that in the course of solicitations for the insurance defendant's agent suggested double indemnity, and left a similar pamphlet with her husband. The court said:

"The document offered by plaintiff is thus probative of the fact that the general words of this policy were used by both insurer and insured to connote accidental death by carbon monoxide as among the contingencies in which double indemnity would be paid. . . . Had the excluded evidence been admitted, the jury could have found that the insured was induced to accept the policy by a clear assertion that death by carbon monoxide was not to be understood as death by poison or gas within the exception to the provision for double indemnity in the event of fatal accident."

The court quoted the American Law Institute, Restatement of Contracts, § 242, and cited 5 Wigmore on Evidence, 2d ed., §§ 2463, 2465, and earlier New York cases, and reversed the trial court. One paragraph of the syllabus reads:

"The circumstances under which parties contract may be looked at to indicate the proper choice of possible meanings of a writing even though it be not, on its face, ambiguous." (Syl. ¶ 2.)

In the circular in that case, as in the booklet here, there was no effort to change the terms of the policy. All that was being done was explaining the policy, and the contract was made in harmony with the explanation. Other cases in which it was claimed a booklet, letter or circular influenced the applicant could be cited. In some of them the insurer was held bound and in others not, depending upon who prepared the literature and what it contained and how it was used.

The insurer here does not contend that it did not prepare the booklet in question and send the same to its agent; neither does it contend that the agent improperly used it in soliciting plaintiff's insurance. Neither is it contended that the booklet does not disclose that the dividend upon the policy issued to plaintiff would be computed on the same basis as dividends upon similar policies which did

not contain special benefits, nor that the booklet did not advise plaintiff that any increase or decrease in future dividend scales would correspondingly increase or decrease the figures set out in the booklet. Neither is it contended that the plaintiff did not understand and rely upon the representations contained in the booklet. Indeed, it would appear from the record as a whole that if the president of the insurer or any of its officers had been present, similar representations would have been made to plaintiff, for the insurer so understood it and acted upon that basis for ten years.

The insurance law of New York (ch. 30, sec. 83), as applicable here, shortly stated, provides that on December 31 of each year the insurer shall ascertain the surplus earned by it during the year, and after setting aside sums for certain items "shall apportion the remaining surplus equitably" to the policies entitled to share therein.

The insurer here contends that since losses upon policies of the kind held by plaintiff have been somewhat greater than was anticipated, it would be inequitable to pay dividends upon plaintiff's policy on the same basis as on policies otherwise similar but without special benefits. To illustrate this counsel present the analogy of plaintiff's "mythical twin brother" who, on the same day plaintiff took out the policy here in question, took out a policy similar to it but without special benefits, and argue it is "inequitable" for the insurer to pay plaintiff the same dividend they would pay the twin brother. The analogy should go a little further. Let it also be assumed that the same agent took the application for both policies; that he explained the basis of the insurer for computing dividends upon each of them; that one of the policies cost more money in premiums than the other but had some special benefits, and with this knowledge the plaintiff chose one policy at greater cost to him, and his twin brother chose a similar policy but without special benefits at a less cost, and both of them knew and understood that their dividends would be computed upon the same basis. In such a situation the lack of "equitable" distribution of dividends as between them becomes "mythical." I have rather a deep-seated notion that when competent parties, fully informed and with no intention of being unfair to each other—and in this case there is no contention that either the plaintiff or the insurer through its agent attempted to be unfair to the other—make a contract in terms which both of them understand, that it is equitable for each of the parties to carry out its part of the contract.

The circumstances which brought this controversy about are quite

freely stated. When, about 1913, defendant prepared to issue an ordinary life policy with certain special benefits, it ascertained as best it could the amount of extra premium it would have to charge for that kind of a policy and pay the same dividends upon it as it did with its policies of the same character without special benefits. Whether such extra premium would prove adequate for this purpose was, of course, not definitely known. For some twenty-three years it continued to issue such policies and pay the same dividends upon them that it did upon like policies without the special benefits. In the meantime it discovered that the losses upon such policies with special benefits were greater than had been anticipated. Of course, as to policies to be issued in the future it could handle the matter by not issuing them, or by charging greater premiums. As to policies previously issued, apparently thinking it could not legally cancel the policy, or raise the premium rate, or decrease the benefits, or decrease the special benefits, it conceived the notion of accomplishing the same result by decreasing the amount of dividends. In my judgment it had no more right to do the one than the other. Certainly, what the insurer has done in this case has decreased the value of this policy to the holder. It has taken from him dividends which he did in fact use to purchase additional insurance and which he might have collected in cash or used in some other way. It is my judgment that the insurer violated its insurance contract with plaintiff when it did so.

In 1930 the insurance commissioner of the state of New York advised all authorized life insurance companies of his ruling pertaining to "Minimum valuation requirements for disability benefits included in life policies issued after June 30, 1930." Since this policy was issued prior to that date, most of the ruling does not pertain to it, but the ruling contained the following:

"On business issued prior to July 1, 1930, companies should accumulate over a period of a few years such additional reserves over and above the Hunter's table as appear sufficient in the light of the best information available to take care of the liberal disability benefits granted in the past."

This is the only ruling respecting the matter shown by the abstract to have been made by the commissioner of insurance of New York. I see nothing wrong with it. It fixed a date as of July 1, 1930, for the actuarial security of policies issued after that date, and required insurers to accumulate such a reserve as would take care of their obligations upon policies issued prior thereto. Apparently the appellee did so until 1937, when it appears from the abstract to have

issued a circular to the effect that dividends on policies containing special benefits were computed to be less than on otherwise similar policies without such benefits, stating that this was done "with the knowledge and approval of the New York State Insurance Department, and is likewise in accordance with a recent decision of the Court of Appeals (the highest court in New York state) in a suit involving just such a distinction in dividends." Nothing from the insurance department of the state of New York is shown in the record to indicate that it had knowledge of or approved the insurer's action. We may assume that the "recent decision of the Court of Appeals" referred to is *Rhine v. New York Life Ins. Co.*, 273 N. Y. 1, 6 N. E. 2d 74. However, as previously pointed out, that case did not involve a specific contract with an insured predicated upon the information contained in a booklet issued by the insurer and the representations of the insurer's agent made at the time the application for the policy was taken. Had the New York Court of Appeals had that kind of a showing before it, as it had a similar showing in *Rasmussen v. New York Life Ins. Co.*, supra, its decision, no doubt, would have been the other way as regards that specific policy.

I have only this to say with reference to the powers of the board of directors in issuing its circular in 1937, above referred to, that it had no authority to violate the contract which the insurer's agent made with plaintiff with the full knowledge and approval of the insurer. I think the duty of the board of directors was to conform to the ruling of the insurance commissioner of the state of New York respecting business issued prior to July 1, 1930, by building up such a reserve as would take care of the liabilities of the company on its policies previously issued.

It is no financial hardship on the insurer to pay dividends on the basis of its agreement with appellant, as explained in the booklet and as actually carried out until 1937. The record in this case discloses that the insurer is a prosperous going concern. On December 31 of each year it ascertains the surplus earned by it during the year, sets aside certain items, and disburses the remainder among its policyholders. It has only the one fund to disburse, and it disburses that fund. It costs the insurer no more to disburse the fund as it had done up to 1937 than it does to disburse the fund by paying a smaller amount of it to plaintiff and a larger amount of it to plaintiff's "mythical twin brother." This theory of "equity" is too mythical for me to understand.

The testimony offered by plaintiff and rejected by the court should have been received, but the ruling is not very material in view of the trial court's finding that the booklet was shown to plaintiff by insurer's agent and that plaintiff understood and relied upon the method of the insurer in classifying policies for the payment of dividends as shown by the booklet. The insurer now takes the position that plaintiff had no right to rely upon the booklet or its agent's explanation of the various policies which it issued. To me, that is an unwarranted position for the insurer to take, and, if sustained, a dangerous one for insurers.

The judgment of the court below should be reversed with directions to enter judgment for plaintiff.